J-S37005-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ROBERT LEE BEAVERS, JR. | |
| Appellant | No. 136 MDA 2017 |

Appeal from the PCRA Dated December 20, 2016
In the Court of Common Pleas of the 39th Judicial District
Franklin County Branch
Criminal Division at No: CP-28-CR-0002258-2012

BEFORE:  STABILE, MOULTON, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                **FILED AUGUST 23, 2017**

Appellant Robert Lee Beaver, Jr. appeals from the December 20, 2016 order of the Court of Common Pleas of the 39th Judicial District, Franklin County Branch ("PCRA court"), which denied his request for collateral relief under the Post Conviction Relief Act (the "PCRA"), 42 Pa.C.S.A. §§ 9541-46. Upon review, we affirm.

The facts and procedural history of this case are undisputed.  Briefly, a jury convicted Appellant of crimes in connection with his sexual abuse of his 10-year-old step-niece.[1]   On November 6, 2013, the trial court sentenced

_____

[1] Specifically, the jury found Appellant guilty of involuntary deviate sexual intercourse with a child, indecent assault of a child, corruption of minors, and simple assault of a child.  **See** 18 Pa.C.S.A. §§ 3123(b), 3126(a)(7), 6301(a), and 2701(a)(1) and (b)(2), respectively.

him to an aggregate term of 11 to 34 years' imprisonment. Appellant appealed to this Court. On November 18, 2014, a panel of this Court affirmed his judgment of sentence. ***Commonwealth v. Beavers***, 113 A.3d 351 (Pa. Super. 2014) (unpublished memorandum). Our Supreme Court denied Appellant's petition for allowance of appeal on May 28, 2015. ***Commonwealth v. Beavers***, 117 A.3d 294 (Pa. 2015).

On November 23, 2015, Appellant filed a *pro se* PCRA petition, raising, *inter alia*, claims of ineffective assistance of counsel. The PCRA court appointed counsel, who, on April 4, 2016, filed an amended petition, claiming that Appellant's trial counsel was ineffective in failing to call character witnesses. Following a hearing, on December 20, 2016, the PCRA court denied Appellant relief, concluding that, while Appellant's ineffectiveness claim had arguable merit, Appellant failed to establish the reasonable basis and prejudice prongs of the ***Pierce***[2] test.

Appellant timely appealed to this Court. The PCRA court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied, raising a single assertion of error:

> [I.] Whether the [PCRA] court's finding that trial counsel's failure to call character witnesses during [Appellant's] jury trial did not amount to ineffective assistance of counsel, and subsequent denial of [Appellant's] petition for post-conviction collateral relief, is supported by the record and free from legal error where three character witnesses were present and willing to testify at trial, known to trial counsel, knew [Appellant's] reputation in

---

[2] ***Commonwealth v. Pierce***, 527 A.2d 973 (Pa. 1987).

community, and would have bolstered defense counsel's trial strategy?

Rule 1925(b) Statement, 2/6/17. In response, on February 7, 2017, the PCRA court issued a Pa.R.A.P. 1925(a) opinion, largely adopting its December 20, 2016 opinion.

On appeal,[3] Appellant repeats the same ineffectiveness claim. After careful review of the record and the relevant case law, we conclude that the PCRA court accurately and thoroughly addressed Appellant's ineffectiveness claim. *See* PCRA Court Opinion, 12/20/16, at 7-28; PCRA Court Rule 1925(a) Opinion, 2/7/17, at 4. Accordingly, we affirm the PCRA court's December 20, 2016 order. We further direct that a copy of the PCRA court's December 20, 2016 opinion and its February 7, 2017 Rule 1925(a) opinion be attached to any future filings in this case.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/23/2017

---

[3] "In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination 'is supported by the record and free of legal error.'" *Commonwealth v. Fears*, 86 A.3d 795, 803 (Pa. 2014) (quoting *Commonwealth v. Rainey*, 928 A.2d 215, 223 (Pa. 2007)).

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA - FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | CRIMINAL ACTION |
| | : | |
| vs. | : | No: 2258-2012 ✓ |
| | : | |
| Robert Lee Beavers, Jr., | : | *PCRA* |
| Defendant | : | |
| | : | Honorable Carol L. Van Horn |

## OPINION AND ORDER OF COURT

Filed    DEC 20 2016

*Nancy Marshall*
Clerk

Before Van Horn, J.

87

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
# OF PENNSYLVANIA - FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | **CRIMINAL ACTION** |
| | : | |
| vs. | : | **No: 2258-2012** |
| | : | |
| Robert Lee Beavers, Jr., | : | *PCRA* |
| Petitioner | : | |
| | : | **Honorable Carol L. Van Horn** |

## STATEMENT OF THE CASE

On August 8, 2013, Robert Lee Beavers, Jr. ("Petitioner") was convicted by a jury of his peers of Involuntary Deviate Sexual Intercourse with a Child,[1] Indecent Assault of a Child,[2] Simple Assault,[3] and Corrupting the Morals of a Minor[4]. The jury trial occurred before the Honorable David E. Grine, S.J.. Attorney Tammy Dusharm represented Petitioner through the trial. Petitioner was not determined to be a Sexually Violent Predator ("SVP"). On November 6, 2013, Petitioner was given a lifetime Megan's Law registration requirement, and was sentenced to an aggregate incarceration term of 132 to 408 months in a State Correctional Institution ("SCI"). *See* T.P. Sentencing, November 6, 2013. On November 14, 2013, Petitioner filed a Post-Sentence Motion. On January 17, 2014, the Court denied Petitioner's Post-Sentence Motions in part, denying Petitioner's request for a new trial, modification of sentence, and for bail pending appeal. *See* Order Denying/Granting Post-Sentence Motions, January 17, 2016. The Court granted Petitioner's Post-Sentence Motion to modify sexual offender notice of registration requirement form, amending the form to include the word "not" as Petitioner was not determined to be a SVP. *Id.*

---

[1] 18 Pa. C.S. § 3123(b).
[2] 18 Pa. C.S. § 3126(a)(7).
[3] 18 Pa. C.S. § 2701(a)(1).
[4] 18 Pa. C.S. § 6301(a)(1)(i).

On January 22, 2014, Petitioner filed a Notice of Appeal. Petitioner filed his Concise Statement of Matters Complained of on Appeal on January 31, 2014. On March 25, 2014, the Court responded to Petitioner's Concise Statement, and transmitted the Record to the Superior Court. The Superior Court affirmed the Court's judgment of sentence on November 18, 2014.

Petitioner initially filed the present Post Conviction Relief Act ("PCRA") Petition on November 23, 2015. Attorney Kristopher Accardi was ultimately appointed Petitioner's PCRA counsel on December 1, 2016. This Court granted one motion extending Petitioner's deadline to file an amended PCRA Petition on February 2, 2016. Petitioner filed an Amended PCRA on April 4, 2016. Hearing on the Petition occurred on August 25, 2016 at which time the Court directed the parties to file briefs. The Commonwealth advised this Court it would not be filing a brief on September 16. 2016. Petitioner filed his brief on September 19, 2016. The issue is now ripe for decision in this Opinion and Order of Court.

## BACKGROUND

The above captioned charges arose out of allegations of sexual abuse that occurred on September 18, 2011. At trial, the Commonwealth first called the victim, H.K..

H.K. testified that in September 2011, her biological parents were divorced, and that she was living with her mom, Christina Moser, and that she would visit her father every other weekend. T.P. Trial, August 6, 2013, at 7-9. In September 2011, H.K.'s father was married to Catherine Kabler. *Id.* at 9-10. During her visits, H.K. would also visit members of her stepmother's family. *Id.* Specifically, H.K. would visit the home of her stepmother's father, Robert Beavers Sr., where he and his son Robert Beavers Jr. ("Petitioner") resided. *Id.*

H.K. testified that on one such visit, she was watching television with her brother and Petitioner in Petitioner's bedroom. *Id.* at 11. H.K. stated that when she asked to play on

3

Petitioner's computer, Petitioner responded by telling H.K. that "[she] had to do something for him first." *Id.* H.K. went on to testify that Petitioner "reached up [her] shirt", trying to touch her, and she said no. *Id.* at 11-12. Petitioner then unzipped his pants, and made her perform oral sex on him, while he shoved her down by the neck. *Id.* at 12. H.K. testified that at some point, Petitioner's penis emitted a "white and kind of [] gel type" liquid, which got on her shirt. *Id.* at13. H.K. stated that Petitioner made her squeeze and rub his penis. *Id.* at 16. H.K. also testified that Petitioner touched her on her bottom, through the holes on the seat of the lawn chair she was sitting on. *Id.* at 14. H.K. testified further that when she stood up from the chair, Petitioner slid his hand down her pants, underneath her underwear, around her vaginal area. *Id.* at 14-15. Finally, H.K. testified that after all of this occurred, Petitioner threatened her, saying that "if [she] told anybody that he would kill everything and everybody that [she] loved." *Id.* at 15.

H.K. also provided testimony concerning her younger half-sister, with whom she shares the same biological mother, Christina Moser. *Id.* at 24-25. Specifically, H.K. testified that her half-sister had been sexually assaulted by her own father, and that she had discussed this incident with H.K. prior to H.K.'s own assault by Petitioner. *Id.* at 25.

Following H.K.'s testimony, the Commonwealth called H.K.'s mother, child interview specialist Meghan O'Hare, nurse practitioner Mary Twomey, and Trooper Courtney Pattillo.

H.K. reported the allegations of abuse to her mother after driving home from her father's house. *Id.* at 27. H.K.'s mother then drove them both to H.K.'s father's home, where H.K. told her father and her stepmother about the incident. *Id.* at 27-28. H.K.'s stepmother then called the State Police, and then put H.K.'s mother on the phone to speak with Tropper Patillo. *Id.* at 56-

4

57. The State Police directed H.K. and her mother to the Harrisburg Children's Resource Center ("CRC"). *Id.* at 57-58.

On September 21, 2011, child interview specialist Meghan O'Hare, interviewed H.K. about the allegations of abuse. *Id.* at 73-74. Meghan O'Hare testified that she did interview H.K. regarding the allegations on September 21, 2011. *Id.* at 78-79. O'Hare conducted the interview closed-circuit, *id.* at 76, and Trooper Pattillo watched the recording of the interview at a later date, *id.* at 102-03. O'Hare confirmed that the interview recording that the Commonwealth played for the jury was a fair and accurate depiction of her September 21, 2011 interview of H.K.. *Id.* at 78-81.

Mary Twomey testified that she did examine H.K. on September 21, 2011. *Id.* at 93-94. Twomey testified that the genital exam was normal. *Id.* at 94. However, Twomey also testified that under the circumstances, she would not expect to actually find any damage to H.K.'s genitals. *Id.* at 95. Twomey also testified that she palpated H.K.'s shoulder blade area and neck during the exam, and that H.K. expressed some tenderness and soreness. *Id.* at 95-97.

Trooper Pattillo identified the Petitioner and testified that he interviewed Petitioner on October 12, 2011. *Id.* at 103. With the assistance of his initial report, Trooper Pattillo testified about his initial meeting with Petitioner. Trooper Pattillo testified that he first advised Petitioner that he was not under arrest, that he was free to leave, and explained to him what the investigation concerned. *Id.* at 104. Trooper Pattillo testified that he asked Petitioner about the incident that H.K. disclosed in her interview on September 21, 2011. *Id.* Trooper Pattillo stated that Petitioner admitted to tickling H.K.'s armpits, ribs, and feet. *Id.* However, Trooper Pattillo testified that Petitioner denied having any inappropriate contact with H.K.. *Id.* at 105. Trooper Pattillo then discussed a search of Petitioner's residence, conducted with both Petitioner and

5

Petitioner's father's consent. *Id.* at 105-06. Trooper Pattillo testified that he was able to take photographs during the search, and verified that he had taken the photographs of Petitioner's bedroom previously reviewed during H.K.'s testimony. *Id.* at 107-08.

Trooper Pattillo testified that he briefly interacted with H.K. on October 14, 2011, when H.K. and her mother arrived at the police barracks and produced a lime green soccer shirt. *Id.* at 108. Trooper Pattillo confirmed that the soccer shirt produced by the Commonwealth was the shirt he received from H.K.'s mother. *Id.* at 109. Trooper Pattillo testified that the soccer shirt had been submitted for a forensic exam, and that the serology report concerning the shirt indicated no findings of body fluid or seminal fluid on the portions of the shirt subjected to testing. *Id.* at 109-11.

Trooper Pattillo testified that in April 2012 he contacted Petitioner and advised him that charges were being filed against him, to which Petitioner informed him that he would turn himself in the following day. *Id.* at 115. When Petitioner did not turn himself in the following day, Trooper Pattillo contacted Petitioner and informed him that there were charges against him and he needed to surrender himself to the Chambersburg Police. *Id.* Petitioner indicated he was at the hospital with his father, and that he would not leave his side, and ended the phone call. *Id.* The day after this second conversation, Petitioner did surrender himself to authorities. *Id.* at 116.

Testifying in his own defense, Petitioner testified that H.K. was his sister's stepdaughter, and that she visited his house on a number of occasions. *Id.* at 131. Petitioner denied committing any of the crimes charged. *Id.* at 130. Specifically, he testified that he did not touch H.K. inappropriately, did not suggest that she or force her to perform sexual acts. *Id.* He testified that he did not hurt H.K. in any way. *Id.* at 130-31. He testified that he did not threaten H.K. or her family. *Id.* at 131.

6

Petitioner also testified as to the date of the incident in question occurred. He testified that H.K. went into his room that day, and used his computer. *Id.* He testified that he did not touch H.K. through the chair she was seated on, nor were his fingers capable of fitting through the holes in the seat of that chair. *Id.* at 132. He admitted to tickling H.K.'s armpits, ribs, and feet. *Id.* at 144.

Petitioner testified that he allowed Trooper Pattillo to search his room and did not make him obtain a search warrant. *Id.* at 133. He testified that he was tardy in surrendering himself to the police because he wanted to make sure his father was all right in the hospital before leaving him. *Id.* at 145. Finally, Petitioner testified that H.K. was lying, but that he did not know why she was lying. *Id.* at 151.

Ultimately, the jury found Petitioner guilty on all charges.

## ISSUES

In the instant PCRA Petition, Petitioner raises one ineffective assistance of counsel claim against his trial attorney, Tammy Dusharm. Petitioner claims that his trial counsel was ineffective for the following reason:

I. Failing to call any character witnesses during the jury trial.[5]

## STANDARD OF REVIEW

Our appellate courts review an order dismissing a petition filed under the PCRA to determine whether the decision of the PCRA court "is supported by evidence of record and is free of legal error." *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010) (citations omitted). The scope of review is limited: the reviewing court must view the findings of the PCRA court and the evidence of record in the "light most favorable to the prevailing party at the trial level." *Id.* The decision of the PCRA court may be affirmed "on any grounds if it is

---

[5] Petitioner's PCRA Brief, September 19, 2016, at 1.

7

supported by the record." *Id.* In the case of a purely legal question, the standard of review is *de novo*, and the scope of review is plenary. *See Commonwealth v. Patton*, 985 A.2d 1283, 1286 (Pa. 2009).

### DISCUSSION

The Post Conviction Relief Act (PCRA) was enacted to provide individuals who are convicted of crimes for which they are innocent, or those serving illegal sentences, with a means to obtain collateral relief. *See* 42 Pa.C.S. § 9543. First, the defendant must demonstrate he was convicted of a crime under the law of Pennsylvania, and that he is currently serving a sentence or waiting to do so. *See* 42 Pa. C.S. §9543(a)(1). Second, the petitioner must prove, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated statutory factors. *See* 42 Pa. C.S. §9543(a)(2). Third, a petitioner must demonstrate the issues raised under the Act have not been previously litigated or waived, and finally, that the failure to litigate such issues could not have resulted from a rational, strategic, or tactical decision by counsel. *See id.* at §9543(a)(1), (3)-(4). "Inherent in this pleading and proof requirement is that the petitioner must not only state what his issues are, but also he must demonstrate in his pleadings and briefs how the issues will be proved." *Commonwealth v. Rivers*, 786 A.2d 923, 927 (Pa. 2001).

### I.     Claims for Ineffective Assistance of Counsel

Among the statutory factors from which a conviction or sentence may have resulted in creating an entitlement to post-conviction relief is the ineffective assistance of counsel. 42 Pa.C.S. §9543(a)(2)(ii). In light of the particular circumstances of a case, the ineffective assistance of counsel must have so undermined the truth-determining process that "no reliable adjudication of guilt or innocence could have taken place." *Id.*

8

The assistance of counsel is presumed effective. *See Commonwealth v. Martin*, 5 A.3d 177, 183 (Pa. 2010). Petitioner bears the burden of proving otherwise, accomplished by satisfying the three-pronged test laid out by our appellate courts in *Pierce*. *See Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001). As explained in *Pierce*, Petitioner must establish that the underlying claim of ineffectiveness has (1) arguable merit, (2) that counsel's act or omission had no reasonable basis to advance the Petitioner's interests, and (3) that the Petitioner suffered actual prejudice due to the trial counsel's act or omission. *Id.* at 212.

Failure to satisfy any of the three prongs of the *Pierce* test will result in denial of the claimed ineffective assistance. *See Pierce,* 786 A.2d at 221-22. The inquiry mirrors that set forth by the United States Supreme Court, requiring both a showing that counsel's performance was deficient, and that such deficiency was prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687-91 (1984).

Petitioner asserts that Attorney Dusharm was ineffective for failing to call any character witnesses during the jury trial. *See* Petitioner's PCRA Brief, at 1. Pursuant to the above standards, this Court now analyzes the issues raised by the Defendant.

## A. **Arguable Merit**

First, the defendant must show the underlying substantive claim has arguable merit. *See id.* "Arguable merit exists when the factual statements are accurate and 'could establish cause for relief.'" *Commonwealth v. Barnett*, 121 A.3d 534, 540 (Pa. Super. 2015) quoting *Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa. Super. 2013). Counsel cannot be held ineffective for failing to raise a meritless claim or a non-existent theory. *See Commonwealth v. Tharp*, 101 A.3d 736, 747 (Pa. Super. 2014); *Commonwealth v. Skurkis*, 348 A.2d 894, 896 (Pa.

9

1975) (The Court found no merit to Appellant's claim that counsel was ineffective for failing to assert a voluntary manslaughter theory where there was no evidence of provocation or passion).

Like the present case, in *Commonwealth v. Weiss*, 606 A.2d 439 (Pa. 1992), the only witnesses to provide direct evidence at trial were the victim and the defendant. *See generally* T.P. Trial, August 6, 2013; *Weiss*, 606 A.2d 439. In *Weiss*, the Supreme Court of Pennsylvania explained in pertinent part:

> In a case such as this, where there are only two direct witnesses involved, credibility of the witnesses is of paramount importance, and character evidence is critical to the jury's determination of credibility. Evidence of good character is substantive, not mere makeweight evidence, and may, in and of itself, create a reasonable doubt of guilt and, thus, require, a verdict of not guilty.

*Weiss*, 606 A.2d at 442. Additionally, at Petitioner's PCRA hearing, the Commonwealth conceded that Petitioner's underlying claim for ineffectiveness had merit. *See* T.P. PCRA Hearing, at 48.

Accordingly, Petitioner's claim is not without merit, and thereby satisfies the first *Pierce* prong.

## B. Reasonable Basis

Second, it must be demonstrated that counsel did not have any reasonable basis for their acts or failure to act designed to effectuate the client's interest. *See Pierce*, 786 A.2d at 213. "In considering whether counsel acted reasonably, we look to 'whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success.'" *Barnett*, 121 A.3d at 540 quoting *Stewart*, 84 A.3d at 707. "[J]udicial scrutiny of counsel's performance must be highly deferential." *Commonwealth v. Perry*, 128 A. 3d 1285, 1290 (Pa. Super. 2015).

10

Failure to call a particular witness does not render counsel's assistance *per se* ineffective. *See* Commonwealth v. Michaud, 70 A.3d 862, 868 (Pa. Super. 2013) (quoting Commonwealth v. Auker, 681 A.2d 1305, 1319 (Pa. 1996) ("A failure to call a witness is not *per se* ineffective assistance of counsel for such decision usually involves matters of trial strategy.")). The Pennsylvania Supreme Court has set forth the following requirements for Petitioners who claim that counsel was ineffective as a result of their failure to call a particular witness:

> Where a [Petitioner] claims that counsel was ineffective for failing to call a particular witness, we require proof of that witness's availability to testify, as well as an adequate assertion that the substance of the purported testimony would make a difference in the case. Generally, [the Court] require[s] a defendant to demonstrate that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*See Commonwealth v. Clark*, 961 A.2d 80, 90 (Pa. 2008). In the instant matter, Petitioner argues that trial counsel was ineffective for failing to present the testimony of three character witnesses: John Kennedy, Jessie Smith, and Robert Beavers Sr.. *See* Petitioner's PCRA Brief, at 1.

According to Petitioner, all three witnesses were available to testify at Petitioner's trial, and would have testified as to Petitioner's good reputation within the community. At the PCRA hearing, Petitioner called each potential witness to testify concerning their potential as character witnesses. *See generally id.* Thus, each witness (1) "existed". Each witness also testified that at the time of Petitioner's trial, they were both (2) "available . . . [and (4)] willing to testify for the defense". *See generally id.* At the PCRA hearing, trial counsel provided this Court with testimony concerning her decision to not call the character witnesses provided by Petitioner.

11

During her testimony, trial counsel affirmed that she (3) knew of the existence of each witness. *See generally id.*

Having met the first four general requirements set forth in *Clark*, this Court must next determine whether Petitioner has provided "an adequate assertion" that testimony the three potential character witnesses could have provided at Petitioner's jury trial would have altered the jury's ultimate conviction of Petitioner. Trial counsel testified that her trial strategy was essentially to discredit the victim's testimony by pointing out the inconsistencies within that testimony. T.P. PCRA Hearing, at 43. The Commonwealth cites *Commonwealth v. Fawcett* for the proposition that a "Defendant's reputation for truthfulness is irrelevant for offenses of rape, deviate sexual intercourse, and statutory rape." *Id.* at 49. Indeed, the Pennsylvania Superior Court stated in *Fawcett* that in such cases, evidence that "a defense witness . . . was familiar with [defendant]'s reputation for being a 'truthful person' . . . was irrelevant." *Fawcett*, 443 A.2d 1172, 1175 (Pa. Super. 1982).

The Pennsylvania Rules of Evidence set forth rules for the admissibility of character evidence. Specifically, Pa.R.E. 608 provides in pertinent part:

> (a) **Reputation Evidence.** A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked. Opinion testimony about the witness's character for truthfulness is not admissible.
>
> (b) **Specific Instances of Conduct.** Except as provided [otherwise in the rules of evidence],
>
>> (1) the character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct[.]

12

Pa.R.E. 608. As Petitioner presented three potential character witnesses, this Court will consider each witness in turn.

### i. Potential Character Witness: John Kennedy

The first potential witness to testify at Petitioner's PCRA hearing was John Kennedy, a former Police Chief who had known Petitioner since the time Petitioner was born. *Id.* at 15. When questioned by Petitioner's counsel regarding knowledge of Petitioner's reputation in the community, Mr. Kennedy gave the following responses:

> Q. Would you describe [Petitioner's] reputation as being a good person?
>
> A. Oh, yes.
>
> Q. How about honest?
>
> A. Yeah, he was honest.
>
> Q. Was he a—would you describe his reputation as being a dangerous person or peaceful person?
>
> A. Pardon?
>
> Q. Would you describe his reputation in the community as being that of someone who is dangerous or being a peaceful person?
>
> A. No, he wasn't dangerous.
>
> Q. When you say he wasn't dangerous, was his reputation in the community that of being not a dangerous person?
>
> A. No. I mean, he was always very nice no matter where he was. He come to my house. He played with my kids, played with my grandkids. And he was a very nice boy.

*Id.* at 17.

Despite Mr. Kennedy's testimony at the PCRA hearing, Attorney Dusharm testified that during her pre-trial meetings with Mr. Kennedy, he unequivocally indicated to her that he could

13

not testify regarding Petitioner's reputation. *Id.* at 41 ("[Mr. Kennedy and his wife] unequivocally told me that they were not familiar with any reputation in the community."). Specifically, Attorney Dusharm explained that she had questioned Mr. Kennedy as to whether or not he was familiar with Petitioner's reputation in the community, and that "[o]n different character aspects, [he] said no, he's just a good guy. Or he's always been honest with me." *Id.* at 34-35. Attorney Dusharm testified that she did not believe this testimony "constituted proper character-reputation testimony." *Id.* Attorney Dusharm further testified that she had initially considered Mr. Kennedy as a potential character witness

> Until [she] talked to him and his testimony was essentially going to be [Petitioner] ha[d] always been honest with [him], [he had] never seen [Petitioner] do anything violent, [he had] never—it was all personal experiences that [Mr. Kennedy] was able to testify to. But [Mr. Kennedy] wasn't able to say he ever talked to anybody in the community about [Petitioner]'s reputation for being honest or being peaceful or for being good with kids or anything like that.

T.P. PCRA Hearing, at 36.

It is evident from this testimony that, as the Commonwealth argued, any testimony Mr. Kennedy could have offered as to Petitioner's reputation for honesty would have been "irrelevant" and inadmissible. On their face, Mr. Kennedy's responses constitute either opinion testimony for Petitioner's character for truthfulness, or specific instances of the Petitioner's conduct—both of which are inadmissible pursuant to Pa.R.E. 608. Moreover, taken together with Mr. Kennedy's testimony, Attorney Dusharm's testimony indicates to this Court Mr. Kennedy represented to Attorney Dusharm that he was unable to provide admissible character evidence on behalf of Petitioner.

14

## ii. Potential Character Witness: Jessie Smith

Following Mr. Kennedy's testimony, Petitioner called Jessie Smith—Petitioner's grandmother—to testify at the PCRA hearing. Mrs. Smith gave the following responses to Petitioner's counsel's questions:

> Q. As an adult, how would you describe what kind of a person [Petitioner] was?
>
> A. Gentle from birth. He practically from birth he was kind to people, animals. He had his own dog. He was more or less a guy that liked to stay at home and use his computer and his games. He met a lot of people on the Internet with chess, other countries and all. And he—and some came to visit him.
>
> . . .
>
> Q. Now, did you know other people in the community who knew [Petitioner]?
>
> A. Yes. And he got along well. But like I say, he was a loner. He stayed pretty much to himself. The neighbors liked him. He got— like I say, he had a dog. He went almost daily to the post office and saw people and talked to them.
>
> Q. Prior to him becoming incarcerated, were you familiar with his reputation in the community?
>
> A. Well, pretty much. He stopped by from the post office and talked to me. And mostly it was about games and things of that sort because I liked it, some of that.
>
> Q. Ms. Smith, what I mean, do you know what other people thought of [Petitioner] in the community?
>
> A. They pretty much left him alone. And he talked to everybody. He'd stop and say hello. They pretty much like him. It was— there wasn't any crime or anything like that or any gangs like that he'd gotten involved with.
>
> Q. How do you think people would have described him in the community? What was his reputation?

15

A. I think mostly gentle. They would say he's a nice, gentle person and he's helpful. He helped people, his neighbors especially.

Q. How about honest? Did he have a reputation for being honest or dishonest?

A. Yes. Honest, yes.

Q. How about violent? Did he have a reputation for being a violent person?

A. No, no. I never heard of him hurting anyone. Or like I say, he's gentle. He wasn't a person violent or angry. He'd get upset.

. . .

Q. Did you ever speak with [Petitioner]'s attorney about being a witness?

A. No.

Q. Do you remember ever meeting with [Petitioner]'s attorney?

A. No.

Q. Did you ever have a phone call or a letter from [Petitioner]'s attorney?

A. I might have gotten a letter, you know, to be available. That's about it.

T.P. PCRA Hearing, at 21-25.

Following this Mrs. Smith's testimony, Attorney Dusharm testified regarding her concerns with Mrs. Smith's testimony as a potential character witness. After explaining, as noted above,[6] her concerns with Mr. Kennedy's testimony, Attorney Dusharm gave the following responses to the Commonwealth's direct examination:

---

[6] *See* discussion relating to Mr. Kennedy's testimony, where Attorney Dusharm explained she had originally considered Mr. Kennedy as a character witness until she realized his testimony would essentially be solely personal experiences and not about his reputation in the community. *See also* T.P. PCRA Hearing, at 36.

16

Q. Was the same true for Mrs. Smith and Mr. Beavers, Sr., in the—what you just described? You couldn't elicit information from them that that would have met the reputation-in-the-community standard?

A. That's correct.

. . .

Q. Okay. And also Jessie Smith, did you spend a fair amount of time with her trying to elicit that type of—

A. Yes. I met with my client, [Petitioner], on a number of occasions in person . . . Every time he would come to my office, his grandmother came with him or most of the times. I can't say every time. I spoke with her on a number of occasions. I have a letter in my file that goes along with how her testimony would have been. And she didn't believe he was guilty, she knows he's always been a good person. But there really wasn't any mention of his reputation in the community for pertinent character traits.

Q. The letter you referenced, is that a letter you wrote or she wrote?

A. No. It's a letter that she wrote that's in my file . . . .. [Attorney Dusharm read the letter into the record as follows] 'Regarding Robert Beavers, Jr. . . . The above is my grandson. I am Jessie C. Smith . . . Robert (Bobby) has been a decent person all his life. Intelligent, kind, a mind of his own, with a good imagination. He quit school in the 10th grade. He has dyslexia but found hiimsel on the computer. He made lots of friends, learned to read well. Made writing very well. Bobby got his GED while in jail. Wants to continue his education. I really believe in him. We are very close. He tells me his worries and happiness. He is not guilty . . . of the charges against him. I really wish him lots of luck. Thank you. Mrs. Smith.'

. . .

Q. Had you ever thought about possibly putting these folks on the witness stand and trying to get into the reputation testimony? And if so, did you have any concerns about what might happen if you weren't going to be able to meet the standard for character witness?

17

A. I was afraid, especially with the family members, that the issues that I was afraid [Petitioner's sister] could potentially testify about that would have been incredibly unhelpful could possibly come out or the door would be opened to some prior allegations if the wrong things were said.

Q. What were the specifics of what [Petitioner's sister] discussed with you?

A. There was mention that supposedly at some point when she and [Petitioner] were kids he had done a similar thing to her.

Q. And you were concerned that if these other family character witnesses were called to testify, they might say something that would open the door to that subject?

A. I was . . . I was afraid that we could potentially unintentionally open the door because the witnesses, they're not professional witnesses. They're not used to going to trial. Things can pop out of their mouths that you're not intending to come out of their mouth.

*Id.* at 36-40.

Throughout her testimony, Mrs. Smith referred consistently to her own opinions and specific instances of Petitioner's conduct, both of which are inadmissible as character evidence under Pa.R.E. 608.[7] When questioned as to whether she was familiar with Petitioner's reputation in the community, Mrs. Smith either testified to her own opinion,[8] or with simple answers such as "Yes. Honest, yes." Mrs. Smith's possible testimony, therefore, as a character witness for Petitioner, does not rise to an "adequate assertion that the substance of the purported testimony would make a difference in the case." *Clark*, 961 A.2d at 90.

---

[7] As to her own opinions, *see* above, noting the following references regarding Petitioner: "Gentle from birth", "I think mostly gentle", or "I never heard of him hurting anyone". As to her references to specific instances of conduct, *see* above, noting the following statements: "He met a lot of people on the Internet with chess . . and some came to visit him", "He went almost daily to the post office and saw people and talked to them", or "He helpd people, his neighbors especially".

[8] *See E.g.* : Q. Did he have a reputation for being a violent person? A. No, no. I never heard of him hurting anyone. Or like I say, he's gentle."

18

During the Commonwealth's direct examination of Attorney Dusharm, she testified that she was unable to elicit the type of information that would have met Pa.R.E. 608's reputation-in-the-community standard. She also testified—contrary to Mrs. Smith's testimony—that she spoke with Mrs. Smith "on a number of occasions", and based on those communications, did not believe Mrs. Smith would be able to offer admissible character testimony. It is true that Attorney Dusharm testified she was unaware of whether Mrs. Smith knew about the allegations from Petitioner's sister regarding Petitioner. However, the similarity of the nature of the Petitioner's sister's allegations and the charges of the instant case, coupled with Attorney Dusharm's belief that Mrs. Smith would unlikely be able to offer admissible testimony pertaining to Petitioner's pertinent character traits, would likely given an attorney pause in risking a divulgence of harmful testimony. Moreover, Attorney Dusharm's testimony further suggests that Mrs. Smith's failure to provide admissible reputation evidence was not for lack of understanding as to what constitutes reputation evidence.[9]

Attorney Dusharm's testimony, in tandem with Mrs. Smith's testimony at the PCRA hearing, indicates to this Court that Attorney Dusharm had a reasonable basis for deciding not to have her testify at trial as a character witness for Petitioner.

### iii.    **Potential Character Witness: Robert Beavers Sr.**

Finally, Petitioner called Robert Beavers Sr.—Petitioner's father—to testify. In response to Petitioner's counsel's questions, Mr. Beavers Sr. gave the following responses:

> Q. Prior to his incarceration, were you familiar with [Petitioner]'s reputation in the community?
>
> A. Yes, sir.

---

[9] *See* T.P. Hearing, at 42-43 ("I don't know how much detail I went into on the topic as far as describing what reputation meant. But [Mrs. Smith and Mr. Beavers Sr.] were happy to describe [Petitioner's sister]'s reputation in the community and how they came to that information.").

. . .

Q. And prior to his incarceration, how would you have described [Petitioner]'s reputation in the community?

A. Pretty much everybody liked him. He drove around mowing grass. Sometimes he stayed in the house and played video games.

Q. Did he have a reputation as being an honest person?

A. Yes, sir.

Q. Did he have a reputation as being a nonviolent person?

A. Violent, no. Maybe an argument between his sister and that's it.

Q. I'm sorry. Can you repeat your sentence? I had a little bit of difficulty understanding you.

A. He had a problem with his baby sister.

Q. Okay.

A. That's it.

Q. So he had a reputation as being a peaceful person?

A. Yeah.

Q. Okay. Is that how people in the community would have described him?

A. I would think.

. . .

Q. Okay. Were you—did you ever have discussions with his trial attorney about testifying?

A. I think I did. To be honest with you, I think I did. But they told us they had it all under control, they didn't need no witness.

. . .

20

Q. And if you had been called to testify regarding [Petitioner]'s reputation in the community, what would your testimony have been?

A. The way I always thought, he was innocent, he didn't do nothing like—

Q. I didn't understand you. What did you say?

. . .

A. All right. Can you give me the question again?

Q. Sure. If you had been called to testify about [Petitioner]'s reputation in the community, what would you have said about his reputation?

A. Everybody liked him. I mean, he pretty much good-to-go person.

Q. Would you have described his reputation if you had been asked as being a nonviolent person?

A. Yes, sir, and hardworking person.

Q. How about honest person?

A. He's pretty much honest. I mean, he just—

Q. Was that his reputation in the community, being an honest person?

A. Like I said, everybody pretty much knowed him down there. I tried to get other people to come talk. They're just older people. They trying to stay out of it.

T.P. PCRA Hearing, at 28-31. On the Commonwealth's cross examination, Mr. Beavers Sr. gave the following responses:

Q. Mr. Beavers, you said that your son had a problem with his baby sister. What was the problem?

A. She always showed up banging on the door. Doesn't matter. No reason at all. Just to see if he come down after her. He turned the TV up louder so he can't hear her.

21

Q. Okay. Are you saying the two of them didn't get along too well?

A. They got along real decent for brother and sister. They were 13 of them in my family. We got along most of the time.

Q. So you're saying that she would come up and bang on his door a lot?

A. Not a lot. But she did come up and bang on the door just to torment him a little bit because she wanted to play. He don't want to play. He wanted to be on the computer or video games. And he's not—he wasn't—how you put that? He just wasn't ready for him to play with her.

*Id.* at 31-32.

In addition to the above noted testimony provided by Attorney Dusharm regarding her concerns in the potential character witnesses meeting the reputation-in-the-community standard, Attorney Dusharm testified to the following:

A. And Mr. Beavers, Sr., was also, suffering from some medical issues at the time. And I wasn't confident about his memory at the time. There were certain things that he would remember when talking to you at one point. Then a short while later, a few weeks, month later, he wouldn't remember the same thing. So I wasn't confident in his memory ability at that time. But again, at any point, the testimony that he had described would have been more along the lines of he's always been good. It was experiences, particular incidents that maybe would demonstrate that [Petitioner] was a good guy, but not reputation evidence.

. . .

Q. So your concern was as happened today, [Mr. Beavers Sr.] might open this door, start talking about this problem with the sister, which would then lead to the possibility that the jury is going to hear this happened before or that he had been accused of it before?

A. Correct. Because if he had even mentioned what he mentioned this morning, I would be concerned that even just that could open the door to—he's opened the door to difficulties between the

22

siblings to you being then able to question him about this allegation that occurred when they were kids.

*Id.* at 36-41.

An analysis of Mr. Beavers Sr. testimony suggests that his potential as a character witness provided Attorney Dusharm with a similar quandary to that which she found with Mrs. Smith, as most of the testimony Mr. Beavers Sr. could provide would have been rendered inadmissible by Pa.R.E. 608. *Id.* at 36. Assuming arguendo that Petitioner's argument that Mr. Beavers Sr. was capable of providing admissible character evidence—by meeting the reputation-in-the-community standard—the potential benefit of such testimony is clearly outweighed by the danger Mr. Beavers Sr. posed as a character witness. Namely, the very real possibility that as a lay witness, Mr. Beavers Sr. may—however inadvertently—mention the allegations of Petitioner's sister. Indeed, the likelihood of this occurrence may be determined by a brief skim of the PCRA hearing transcript, identifying the testimony Mr. Beavers Sr. provided concerning Petitioner's "problem with his baby sister." *Id.* at 28.

While testifying, Attorney Dusharm confirmed that her decision not to call Mr. Beavers Sr. stemmed from her fear that his testimony might open the door to the possibility of testimony concerning Petitioner's sister's allegations. *Id.* at 40-41. Moreover, Attorney Dusharm testified regarding her concerns about Mr. Beavers Sr.'s memory, and therefore was unsure as to what he would testify if she put him on the stand at trial. *Id.* at 36.

### iv.    Analysis of Attorney Dusharm's Overall Strategy

It is true, as conceded by the Commonwealth and Attorney Dusharm, *id.* at 44, that like *Weiss*, the availability and presentation of character evidence would likely have proven beneficial to Petitioner. Indeed, the usefulness of character evidence in a case such as the instant one is not disputed. Rather, the Commonwealth contends, and this Court concurs, that while

23

these three character witnesses may have been available and willing to testify on behalf of Petitioner, the testimony they were capable of offering was either inadmissible or outweighed by possible issues such testimony could cause. Therefore, Petitioner has failed to provide "an adequate assertion that the substance of the purported testimony would make a difference in the case." *See Clark*, 961 A.2d at 90.

In opining that trial counsel did not have a reasonable basis for her decision to not call any of the three character witnesses at Petitioner's trial, Petitioner relies heavily upon *Weiss*. In *Weiss*, the Supreme Court of Pennsylvania considered whether a trial counsel's decision to not call certain character witnesses was reasonable. Specifically, Petitioner points to the following rationale provided by the *Weiss* Court:

> In light of the overwhelming need for character evidence in a case such as this, counsel's limited investigation into the quantity and/or quality of potential character witnesses on behalf of appellant, and counsel's prejudice toward familial witnesses, we find no reasonable basis to support trial counsel's decision not to call any character witnesses.

*Weiss*, 606 A.2d at 443. Petitioner seeks to employ this language to bolster his averment that Attorney Dusharm's decision not to call character witnesses at trial was unreasonable. However, this Court finds that the instant case is factually distinguished from the facts in *Weiss*.

Specifically, in *Weiss*, potential character witnesses that were contacted by trial counsel testified at the post-trial hearing that they had known the appellant for a significant amount of time, had socialized with the appellant, and were familiar with his good reputation in the community. *Id.* at 442. The appellant testified that he furnished trial counsel with several potential witnesses, "who were familiar with his reputation, and who would have testified on his behalf at trial", but whom trial counsel never contacted. *Id.* Trial counsel admitted that he had failed to contact any witnesses until the day before trial. *Id.* at 443. Furthermore, trial counsel

24

"failed to respond to his client's inquiries regarding the absence of witnesses, thereby breaching his duty to consult with his client on important decisions." *Id.* Thus, as the Court noted, trial counsel's decision "was not a tactical one made after weighing all of the alternatives, but was based on the fact that he had failed to interview and prepare potential character witnesses, and consult with his client thereto." *Id.*

In challenging Attorney's Dusharm's decision not to call two family member character witnesses, Petitioner cites *Weiss*. Petitioner's PCRA Brief, at 3-5. In *Weiss*, trial counsel disregarded familial witnesses on the basis of a generalized suspected bias on the part of jury members as to familial witnesses in general. As the Court noted, trial counsel even testified "[a]s a policy matter, I don't ever recall every putting on character evidence of family members. I think the jury just thinks it's garbage." *Weiss*, 606 A.2d at 443.

Attorney Dusharm's decision not to call any of the three witnesses is plainly distinguished from the trial counsel's decision in *Weiss*. Attorney Dusharm's decision was based on multiple communications with each witness—not grounded in a "limited investigation into the quantity and/or quality of potential character witnesses". *Id.* Her decision was founded not upon blanket "prejudice toward familial witnesses," *id.*, but rather upon determinations that most of the testimony each witness could offer would be inadmissible or tactically imprudent to the credibility of Petitioner and her overall trial strategy. Attorney Dusharm's decision to not call either family member as character witnesses was not based on a fear that the jury would "think it's garbage" because they are family of Petitioner. Rather, Attorney Dusharm explained that she did not call either family member character witnesses, as a result of a combination of their inability to provide useful and admissible character evidence and the fear that they would open the door to evidence of Petitioner's sister's allegations. Moreover, at the PCRA Hearing,

25

Petitioner's counsel admitted that "[he] knew that's now what Attorney Dusharm [testified]." T.P. PCRA Hearing, at 47. Thus, the instant case is clearly factually distinguished from the broad based fear present within *Weiss*.

This Court is persuaded that Attorney Dusharm had a reasonable basis for her decision not to call any of the three character witnesses. Accordingly, we find that Petitioner has failed this second prong.

### C. **Actual Prejudice**

Finally, a petitioner must demonstrate actual prejudice resulted from counsel's inadequate performance. *See Pierce,* 786 A.2d at 213. A petitioner demonstrates prejudice where he proves that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Commonwealth v. Johnson,* 966 A.2d 523, 533 (Pa. 2009). "To properly determine whether prejudice resulted from the quality of counsel's representation, we must focus on counsel's overall trial strategy and view his performance as a whole." *Hull,* 982 A.2d at 1026 (quoting *Weiss,* 606 A.2d at 443).

For the sake of completeness, we will address this third *Pierce* prong. Assuming arguendo that Petitioner could satisfy the second *Pierce* prong, he fails to show he was prejudiced by Attorney Dusharm's decision. Petitioner argues that Attorney Dusharm's decision to not call any of the three proposed character witnesses resulted in significant prejudice.

As noted above, Attorney Dusharm's overall trial strategy was to highlight the inconsistencies present within the victim's testimony, thereby undermining her credibility. *See* T.P. PCRA Hearing, at 43. Thus, like *Hull* and *Weiss*, presentation of evidence indicative of Petitioner's good character would have bolstered his defense. *Weiss,* 606 A.2d at 443; *Hull,* 982 A.2d at 1026.

26

Petitioner cites *Weiss* and *Hull*, arguing that like both of those cases, this Court should hold Petitioner was prejudiced by trial counsel's failure to call any character witnesses. First, Petitioner points to *Weiss*, where the Court held that "[c]onsidering there was no overwhelming evidence of guilt in this case, credibility of the witnesses was of paramount importance". *Weiss*, A606 A.2d at 443. Petitioner also references *Hull*, where that Court similarly found that trial counsel's strategy—discrediting the victim—would have been bolstered by evidence of Appellee's good character, and that "the evidence against Appellee was [not] so overwhelming that the outcome would not have been different." *Hull*, 982 A.2d at 1026-27.

In *Weiss*, several potential witnesses agreed to testify if needed at trial, but were never contacted by the appellant's attorney. *Weiss*, 606 A.2d at 442. Trial counsel was consequently unaware whether or not those potential witnesses would have been useful in bolstering the credibility of his client. *Id.* at 443. The *Weiss* court therefore held "counsel's error not to employ character witnesses, familial or otherwise, undermined appellant's chances of instilling reasonable doubt in the minds of the jury and resulted in prejudice to the appellant." *Id.*

In *Hull*, the Court qualified the potential character witnesses as "good character witnesses". *Hull*, 982 A.2d at 1027. The Court explained that trial counsel's decision to not present good character evidence was based on "a broad concern that opposing counsel might introduce bad-character evidence on cross-examination without having investigated whether that concern was based in reality", and thus was not reasonable. *Id.* The Court therefore concluded that "the failure to present Appellee's desired character witnesses prejudiced his defense." *Id.*

On review of the case at bar, it is true that, like *Weiss* and *Hull*, there was no overwhelming evidence or proverbial "smoking gun" in the present case. The case was based primarily on the testimony of the victim and her prior statements to authorities and her family.

27

However, Petitioner has failed to show that but for Attorney Dusharm's decision not to call the three character witnesses, the result of his jury trial would have been different. Attorney Dusharm communicated with each character witness on numerous occasions, and determined that the possible benefit they could offer to bolster Petitioner's credibility was either nonexistent—as they failed to demonstrate an ability to offer admissible character evidence—or outweighed by the potential detriment to Petitioner's case as noted above. *See* SECTION B: REASONABLE BASIS (discussing the evidence presented at Petitioner's PCRA hearing, concerning possible evidence the character witnesses could have offered at trial). Attorney Dusharm's pre-trial preparation suggests that, despite the unquestioned value of good character evidence, it is highly unlikely any of the proposed character witnesses in the instant case would have constituted good character evidence. The present case is therefore distinguished from both *Weiss* and *Hull*.

Based on the testimony presented at Petitioner's PCRA hearing, this Court is not persuaded that it is reasonably probable that, had Attorney Dusharm called any of the three character witnesses at trial, the jury verdict would have been different. However, even were this Court to find Petitioner's proposed character witnesses could have bolstered his credibility at trial, Petitioner's IAC claim still fails, pursuant to his failure to meet the second *Pierce* prong. *See generally* SECTION B: REASONABLE BASIS (finding that trial counsel had a reasonable basis for deciding not to present Petitioner's proposed character witnesses at trial).

## CONCLUSION

After careful and diligent review, the Court finds that while the issue raised by Petitioner has arguable merit, Petitioner has failed to prove the other two prongs of Pierce. Pursuant to the attached Order, Defendant's PCRA Petition is DENIED.

28

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA - FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | CRIMINAL ACTION |
| | : | |
| vs. | : | No: 2258-2012 |
| | : | |
| Robert Beavers Jr., | : | |
| Defendant/ Appellant | : | Honorable Carol L. Van Horn |

## OPINION *sur* PA. R.A.P. 1925(a) AND ORDER OF COURT

Filed   FEB 0 7 2017,

Clerk

**Before Van Horn, J.**

93

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA - FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| **Commonwealth of Pennsylvania,** | : | **CRIMINAL ACTION** |
| | : | |
| **vs.** | : | **No: 2258-2012** |
| | : | |
| **Robert Beavers Jr.,** | : | |
| **Defendant/ Appellant** | : | **Honorable Carol L. Van Horn** |

## STATEMENT OF THE CASE

On August 8, 2013, Robert Lee Beavers, Jr. ("Appellant") was convicted by a jury of his peers of Involuntary Deviate Sexual Intercourse with a Child,[1] Indecent Assault of a Child,[2] Simple Assault,[3] and Corrupting the Morals of a Minor[4]. The jury trial occurred before the Honorable David E. Grine, S.J.. Attorney Tammy Dusharm represented Appellant through the trial. Appellant was not determined to be a Sexually Violent Predator ("SVP"). On November 6, 2013, Appellant was given a lifetime Megan's Law registration requirement, and was sentenced to an aggregate incarceration term of 132 to 408 months in a State Correctional Institution ("SCI"). *See* T.P. Sentencing, November 6, 2013. On November 14, 2013, Appellant filed a Post-Sentence Motion. On January 17, 2014, the Court denied Appellant's Post-Sentence Motions in part, denying

---

[1] 18 Pa. C.S. § 3123(b).
[2] 18 Pa. C.S. § 3126(a)(7).
[3] 18 Pa. C.S. § 2701(a)(1).
[4] 18 Pa. C.S. § 6301(a)(1)(i).

1

Appellant's request for a new trial, modification of sentence, and for bail pending appeal. *See* Order Denying/Granting Post-Sentence Motions, January 17, 2016. The Court granted Appellant's Post-Sentence Motion to modify sexual offender notice of registration requirement form, amending the form to include the word "not" as Appellant was not determined to be a SVP. *Id.*

On January 22, 2014, Appellant filed a Notice of Appeal. Appellant filed his Concise Statement of Matters Complained of on Appeal on January 31, 2014. On March 25, 2014, the Court responded to Appellant's Concise Statement, and transmitted the Record to the Superior Court. The Superior Court affirmed the Court's judgment of sentence on November 18, 2014.

Appellant initially filed the present Post Conviction Relief Act ("PCRA") Petition on November 23, 2015. Attorney Kristopher Accardi was ultimately appointed Appellant's PCRA counsel on December 1, 2015. This Court granted one motion extending Appellant's deadline to file an amended PCRA Petition on February 2, 2016. Appellant filed an Amended PCRA on April 4, 2016. Hearing on the Petition occurred on August 25, 2016 at which time the Court directed the parties to file briefs. The Commonwealth advised this Court it would not be filing a brief on September 16. 2016. Appellant filed his brief on September 19, 2016.

On December 20, 2016, this Court issued an Opinion and Order denying Appellant's requested relief and dismissing his Amended PCRA Petition.

2

Appellant filed a timely Notice of Appeal on January 17, 2017. The same day, this Court ordered the Appellant file a Concise Statement of Matters Complained of on Appeal. Appellant filed his Concise Statement on February 6, 2017. This Court will now respond to Appellant's claim of error in this Opinion and Order of Court pursuant to Pa.R.A.P. 1925(a).

## ISSUES RAISED

In Concise Statement, Appellant questions whether this Court erred in denying the ineffective assistance of counsel claim brought before it in Appellant's Amended PCRA Petition. Specifically, Appellant raises the following issue:

I. Whether the Trial Court's finding that trial counsel's failure to call character witnesses during the Defendant's jury trial did not amount to ineffective assistance of counsel, and subsequent denial of the Defendant's petition for Post-Conviction Collateral Relief, is supported by the record and free from legal error where three character witnesses were present and willing to testify, known to trial counsel, knew the defendant's reputation in the community, and would have bolstered defense counsel's trial strategy?[5]

---

[5] Concise Statement of Matters Complained of on Appeal, February 6, 2017.

3

## STANDARD OF REVIEW

Our appellate courts review an order dismissing a petition filed under the PCRA to determine whether the decision "of the PCRA court is supported by evidence of record and is free of legal error." *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010) (citations omitted). The "scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level." *Id.* The decision of the PCRA court may be affirmed "on any grounds if it is supported by the record." *Id.* In the case of a purely legal question, the standard of review is *de novo*, and the scope of review is plenary. *See Commonwealth v. Patton*, 985 A.2d 1283, 1286 (Pa. 2009).

## DISCUSSION

The issue raised by Appellant mirrors the issue raised in his PCRA Petition, and addressed by this Court in our December 20, 2016 Opinion and Order of Court which is incorporated herein by reference. Accordingly, this Court declines to address the issue again here, and we refer the Superior Court to the reasoned analysis set forth in our previous Opinion. Ultimately, the Court finds the Appellant's ineffective assistance of counsel claim is without merit, and respectfully requests that the Superior Court affirm our December 20, 2016 Order dismissing Appellant's claims.

4

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA - FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | CRIMINAL ACTION |
| | : | |
| vs. | : | No: 2258-2012 |
| | : | |
| Robert Beavers Jr., | : | |
| Defendant/ Appellant | : | Honorable Carol L. Van Horn |

## ORDER OF COURT

AND NOW THIS 7th DAY OF February, 2017, pursuant to Pa. R.A.P. 1931(c),

**IT IS HEREBY ORDERED THAT** the Clerk of Courts of Franklin County shall promptly transmit to the Prothonotary of the Superior Court the record in this matter along with the attached Opinion *sur* Pa. R.A.P. 1925(a).

*Pursuant to Pa. R. Crim. P. 114, the Clerk of Courts shall immediately docket this Opinion and Order of Court and record in the docket the date it was made. The Clerk shall forthwith furnish a copy of the Opinion and Order of Court, by mail or personal delivery, to each party or attorney, and shall record in the docket the time and manner thereof.*

By the Court,

_____
Carol L. Van Horn, P.J.

copies:
Franklin County District Attorney's Office
Kristopher Accardi, Esq., Counsel for Defendant

5